# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**HEATHER BEERMAN,**

      **Plaintiff,**

                             **Case No. 2:16-cv-896**

   **v.**

                             **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Heather Beerman, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the Court for disposition based upon the parties' full consent (ECF No. 15) and for consideration of Plaintiff's Statement of Errors (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 19), Plaintiff's Reply (ECF No. 20), and the administrative record (ECF No. 17). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.   BACKGROUND

Plaintiff filed her application for benefits on April 25, 2013, alleging that she has been disabled since December 24, 2012. (R. at 79, 91, 150–56.) Plaintiff's application was denied initially and upon reconsideration. (R. at 92–95, 99–101.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 102–03.) Administrative Law Judge Jeannine Lesperance ("ALJ") held a hearing on March 26, 2015, at which Plaintiff, who was represented

by counsel, appeared and testified.  (R. at 41–66.)  On May 22, 2015, the ALJ issued a decision

finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 21–

34.)  On July 19, 2016, the Appeals Council denied Plaintiff's request for review and adopted the

ALJ's decision as the Commissioner's final decision.  (R. at 1–7.)  Plaintiff then timely

commenced the instant action.

## II.    HEARING TESTIMONY[1]

### A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she is five feet, four inches tall and

weighs about 180 pounds.  (R. at 47.)  She has been working hard to lose weight, including

walking and trying not to eat sweets.  (*Id*.)  She tries to walk four times a week, but a lot of times

she walks only two times a week because of her headaches.  (*Id*.)  Her walks last about twenty

minutes long.  (*Id*.)

Plaintiff lives with her husband and fourteen-year old daughter.  (R. at 48.)  They have

two cats.  (*Id*.)

Plaintiff has a driver's license and drives four or five times a week.  (*Id*.)  She drives to

the grocery store and takes her daughter to school.  (R. at 48–49.)  She also drove to Indianapolis

in the year prior to the administrative hearing.  (R. at 49.)  Her husband drove her to the

administrative hearing.  (*Id*.)

Plaintiff has a high school diploma and earned an associate's degree in respiratory

therapy.  (*Id*.)

Plaintiff previously worked as a respiratory therapist, working twelve-hour shifts from

7:00 p.m. until 7:00 a.m.  (R. at 49–50.)  According to Plaintiff, thirty-six hours is considered

---

[1] The Court limits the analysis of the evidence and the administrative decision to the issues raised
in the Statement of Errors.

full-time.  (R. at 50.)  Plaintiff testified that she stopped working in November 2012 when she was let go because she was not wearing the correct uniform.  (*Id*.)  She did not look for another job at that time because her "headaches were starting to get to" her.  (*Id*.)  She explained that there was a gap in her employment record from 2004 to 2009 because she was a stay at home mother during that time.  (*Id*.)

Plaintiff testified that she had been prescribed pain medicine for over twenty years for migraines and she went to rehabilitation when her doctor decided that pain medicine was no longer an option.  (R. at 51.)  She explained that "the pain medicine just kind of took away the edge so that I could continue with my job."  (*Id*.)  However, now that she cannot take that medicine when she gets a headache, she is stuck in bed between one day to one week, and "it's the absenteeism that gets me."  (*Id*.)  According to Plaintiff, she is fine when her headaches are not there, but she is unable to work when she gets them.  (*Id*.)

Plaintiff explained that she knows when she will get a migraine because it usually starting out with a feeling or an aura in her eyes.  (*Id*.)  She said it is usually in her left eye and it feels like somebody is stabbing it with an ice pick.  (*Id*.)  She becomes nauseated.  (*Id*.)  Sound, light, and movement make her headaches worse, so she ends up lying in bed with an ice pack for a day or two, up to a week.  (*Id*.)

Plaintiff testified that some of the medicines she takes for her migraines cause side effects, including nausea and diarrhea "so that even after the migraine is over I have like maybe a day of recovery when I'm in the restroom most of the day."  (*Id*.)  She has medicine that she takes as both a preventative and also when she has a migraine.  (R. at 52.)  Plaintiff testified that it is hard to determine if the medicines help her at all because she has had headaches for so long.

(*Id*.)  Other than resting in a dark room and medicine, there is nothing else Plaintiff does to alleviate the headaches.  (R. at 52–53.)

Plaintiff denied that any of her neurologists suggest more invasive testing.  (R. at 53.) Plaintiff has had CTs, MRIs, EEGs, and EKGs, which revealed no abnormalities.  (*Id*.)  She testified that the doctors are not sure what causes her migraines.  (*Id*.)

Plaintiff agreed that before she went into a detox program, she had daily headaches that her doctors thought might have been caused by the narcotics.  (*Id*.)  Plaintiff had headaches three to four times days a week when she was on narcotics and since she stopped taking the narcotics she has headaches two to three days a week.  (*Id*.)  Plaintiff testified that she has a lot more pain now because she is not allowed to take pain medicine any more.  (R. at 52–53.)  On a scale of one to ten with ten being the worst, Plaintiff  testified that, with narcotic medication, her migraine pain would start at an eight and it would go down to a four. (R. at 54.)  With her current medication, her pain begins at an eight and goes down to a six and a half.  (*Id*.)  She is allowed to take one medicine, Ultram, and that sometimes helps along with Maxalt.  (*Id*.)  However, her insurance gives her only four Maxalt pills a month, so she has to spread them out.  (R. at 54–55.)

Plaintiff testified that she was sick so many times on three jobs that they told her she could quit or it would go on her file that they fired her, so she quit.  (R. at 55.)

Plaintiff also testified that she has missed out on activities because of her headaches, including going to see friends, her daughter's school plays and other school activities, and having to rely on other people to take her daughter places.  (R. at 57.)

Plaintiff denied using any narcotics since her detox.  (R. at 58.)  She has tried acupuncture, acupressure, chiropractic adjustments, biofeedback therapy, and injections, but none have brought her lasting relief.  (R. at 58–60.)  Plaintiff has also tried diets and eliminating

foods to see if that causes migraines.  (R. at 59.)  Plaintiff identified raw onions and weather changes as migraine triggers.  (*Id*.)

**B.    Vocational Expert Testimony**

Carl Hartung testified as a vocational expert ("VE") at the March 26, 2015, administrative hearing.  (R. at 60–64.)  The VE testified that Plaintiff's past employment included respiratory therapist, a medium exertion, skilled position.  (R. at 61.)  The ALJ proposed a hypothetical that presumed an individual with Plaintiff's age, education, and work experience, with no climbing ladders, ropes or scaffolds, no workplace hazards such as unprotected heights and dangerous machinery, capable of working in an environment that has moderate noise or less, no exposure to heavy vibration such as operating a jackhammer, no exposure to extreme temperatures, and no working in bright light.  (R. at 61–62.)  The VE testified that such an individual could perform Plaintiff's past work as it was actually and generally performed.  (R. at 62.)  The VE testified that such a hypothetical individual would be capable of performing medium exertion, unskilled jobs available regionally and nationally such as a laboratory equipment cleaner, sexton, and dietary aide.  (R. at 62–63.)

The ALJ then asked the VE whether a hypothetical individual with Plaintiff's age, education, and work experience, and residual functional capacity, would be capable of performing light, unskilled work other than Plaintiff's past work.  (R. at 63.)  The VE testified that such a hypothetical individual would be capable of performing light exertion unskilled jobs available regionally and nationally such as marker, routing clerk, and sales attendant.  (R. at 63–64.)  When asked if unscheduled partial absence from work two days a week would preclude the hypothetical individual from competitive work at the unskilled level, the VE responded that he "think[s] in the long run it still would be unacceptable."  (R. at 64.)

# III.    MEDICAL RECORDS

## A.    Nahid Dedmehr, M.D.

Prior to her alleged onset date of December 24, 2012, Plaintiff treated with a neurologist, Nahid Dedmehr, M.D.  (R. at 335–43.)  On July 8, 2003, Plaintiff complained of worsening headaches and Dr. Dedmehr noted that she had seen several specialists in the past and tried several different medications without noticeable improvements.  (R. at 342.)  He also noted that bright lights, stress, raw onions, changes in weather, and menstruation trigger her migraines. (*Id.*)  Plaintiff reported experiencing headaches three to four times a week and that she was told that if she misses more work, she will lose her job.  (*Id.*)

On January 28, 2004, Plaintiff continued to complain of frequent headaches, but reported that the intensity had decreased and usually went away with Maxalt and pain medication.  (R. at 340.)  She also took Ambien and did not report any side effects from her mediation.  (*Id.*)

Plaintiff presented to Dr. Dedmehr for follow up on December 5, 2005, having last seen him in August 2004.  (R. at 337.)  Dr. Dedmehr noted that she had a hysterectomy in July 2005. (*Id.*)  Plaintiff reported slight improvement in headaches, but continued to have headaches three to four times weekly.  (*Id.*)  She did not report any changes in her headache characteristics from a year and a half ago.  (*Id.*)  Plaintiff reported that she had to stay in bed three or four days in a row unless she takes Vicodin or Percocet.  (*Id.*)  Plaintiff also reported that her headaches tremendously affected her lifestyle.  (*Id.*)

On October 2, 2006, Plaintiff presented to Dr. Dedmehr for a follow up appointment October 2, 2006.  (R. at 335.)  Plaintiff did not report worsening of her headaches and Dr. Dedmehr noted that Plaintiff's headaches had improved with increased dosage of Effexor.  (*Id.*)

**B.      James Dunnan, M.D.**

On December 3, 2012, Plaintiff's primary care physician, James Dunnan, M.D., recommended that she seek detoxification treatment.  (R. at 424.)

Upon examination on May 21, 2013, Plaintiff reported experiencing two to three headaches a week.  (R. at 438.)

On May 21, 2013, Dr. Dunnan completed a Residual Functional Capacity Questionnaire regarding Plaintiff's headaches.  (R. at 464–71.)  Dr. Dunnan noted that he has seen Plaintiff every one or two months for the past ten years.  (R. at 465.)  He reported that Plaintiff suffered from headaches two to three times a week in the left temple area, which he described as a stabbing pain, accompanied with pre-migraine auras.  (*Id*.)  Dr. Dunnan reported that Plaintiff's headaches last hours to days at a time.  (R. at 465–66.)  He further reported that Plaintiff experienced nausea/vomiting, photosensitivity, visual disturbances, mood changes, and mental confusion associated with her headaches.  (R. at 466.)  Dr. Dunnan identified bright lights, raw onions, hunger, lack of sleep, stress, strong odors, vigorous exercise, and weather changes as headache triggers.  (*Id*.)  He identified bright lights, coughing, straining/bowel, moving around, and noise as making Plaintiff's headaches worse.  (*Id*.)  Dr. Dunnan stated that lying in a dark room, finger pressure/massage, and cold packs make her headaches better.  (R. at 467.)  He identified migraines and anxiety/tension as the impairments that could reasonably be expected to explain her headaches.  (*Id*.)  Dr. Dunnan denied that Plaintiff was a malingerer.  (*Id*.)  He noted that emotional factors somewhat contribute to the severity of her headaches and that her impairments were reasonably consistent with the symptoms and functional limitations described in the questionnaire.  (*Id*.)  Dr. Dunnan opined that during the times Plaintiff has a headache, she would generally be precluded from performing even basic work activities and need a break from

the workplace and that she will sometimes need to take unscheduled breaks during an eight-hour working day. (R. at 468.) He stated that these breaks could be one to two times a week and that she would have to rest one or two days after a headache before returning to work. (*Id*.) He further stated that Plaintiff would need to lie down or sit quietly during a break. (R. at 469.) Dr. Dunnan estimated that Plaintiff would be absent more than four times a month because of her impairments. (*Id*.) When asked to describe any other limitations that affect Plaintiff's ability to work at a regular job on a sustained basis, Dr. Dunnan

Dr. Dunnan also completed a questionnaire provided by the Division of Disability Determination on October 22, 2013. (R. at 451–54.) He stated that Plaintiff suffered from migraines two to three times a week with associated nausea and sensitivity to light and sound. (R. at 452.) Dr. Dunnan reported that she was being treated by a neurologist, that an MRI of her brain was normal, and that there was no future surgical or clinical plan to treat the migraines. (*Id*.) He reported that Plaintiff was stable on her current treatment regimen and he reported no issues with compliance that interfered with this treatment. (R. at 453.) When asked to describe any limitations her impairments imposed on the ability to perform sustained work activity, Dr. Dunnan responded that commuting is very difficult due to her symptoms and severe pain in spite of medication as well as her sleeping troubles resulting from her headaches would lead to difficulties working the next day. (*Id*.)

Plaintiff presented for examination on April 23, 2014, complaining of skin tags and asking for refills of her medication. (R. at 461.)

On November 10, 2014, Plaintiff reported experiencing migraines two to three times a week. (R. at 463.)

## C.     Abdelhakim Hussein, M.D.

Upon referral from Dr. Dunnan, Abdelhakim Hussein, M.D., a neurologist, examined Plaintiff on May 17, 2012.  (R. at 414–17.)  At this initial visit, Plaintiff reported a long history of headaches and migraines that lately had occurred one to two times per week with each episode lasing for six to eighteen hours.  (R. at 414.)  Plaintiff described stabbing pain accompanied by nausea, photophobia, phonophobia, and visual auras.  (*Id*.)  Plaintiff reported that triggers included bright lights, certain foods, and weather changes and that symptoms improved by resting in a dark, quiet room with an ice pack.  (*Id*.)  Plaintiff had previously undergone MRI testing, EEG testing and a cardiac workup and acupuncture, biofeedback, and chiropractic treatment had failed.  (*Id*.)  Dr. Hussein noted that Plaintiff previously used several prevention medications, including Depakote, Inderal, Topamax, Elavil, Verapamil, Neurontin, and other drugs.  (*Id*.)  Upon examination, Dr. Hussein noted that she was in no acute distress and Plaintiff denied balance difficulty, dizziness, and headache.  (R. at 415–16.)  Dr. Hussein assessed Plaintiff with a migraine without aura, with intractable migraine, and drug induced headache, not elsewhere classified.  (R. at 417.)  Dr. Hussein recommended, among other things, that Plaintiff "has to consider weaning herself from narcotics."  (*Id*.)

Plaintiff presented for follow up examination on December 19, 2012, after she was released from Dublin Springs Hospital and her detoxification program.  (R. at 418–21.)  She reported no change in her migraine features, but she reported no more daily headaches.  (R. at 418.)  Upon examination, Dr. Hussein noted that she was in no acute distress.  (R. at 420.)  He assessed her with a migraine without aura, with intractable migraine, and drug induced headache, not elsewhere classified.  (R. at 420.)  However, he also noted that Maxalt was effective and Inderal helped and was well tolerated.  (R. at 418–21.)

Upon examination on November 22, 2013, Dr. Hussein noted that he last saw Plaintiff seven months ago. (R. at 456.) Plaintiff reported experiencing two to three migraines a week with each episode lasting one day. (*Id.*) However, Plaintiff reported no more daily headaches and she presented in no acute distress. (*Id.*) Dr. Hussein increased her migraine medications. (R. at 457.)

## D.     Dublin Springs Hospital

On December 5, 2012, Plaintiff was admitted to Dublin Springs Hospital, which noted that "she went to her doctor's appointment for pain management, but they refused to prescribe her narcotics anymore and told her to come in to treatment for detoxification." (R. at 346.) Plaintiff acknowledged taking more medications than what was prescribed and she reported misusing her Xanax, Percocet, and Zanaflex, all of which she had been taking more than what was prescribed, and Lortab. (*Id.*) Plaintiff was admitted, placed in medical detoxification, and provided group therapy. (R. at 346–48.) She was discharged on December 12, 2012. (*Id.*)

## E.     State-Agency Evaluations

On June 20, 2013, Leon D. Hughes, M.D., a state-agency physician, reviewed Plaintiff's medical record and based exertional limitations on Plaintiff's chronic migraines. (R. at 74–76.) Dr. Hughes found that Plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for about six hours in an eight-hour workday; and unlimited ability to push and/or pull. (R. at 75.) He further found that she had an unlimited ability to climb ropes/stairs; balance; stoop; kneel; crouch; and crawl, but she could never climb ladders/ropes/scaffolds. (*Id.*) Dr. Hughes also found that she had environmental limitations and should avoid concentrated exposure to noise and vibration. (R. at 76.)

On October 16, 2013, Paul Morton, M.D., reviewed the record upon reconsideration. (R. at 86–88.) Dr. Morton agreed with the limitations found by Dr. Hughes. (*Id.*)

## IV.    ADMINISTRATIVE DECISION

On May 22, 2015, the ALJ issued her decision. (R. at 21–34.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity from December 24, 2012, the alleged onset date, through her date last insured of December 31, 2013. (R. at 23.)

At step two, the ALJ determined that Plaintiff had the medically determinable impairments of migraine headaches and obesity. (*Id.*)

The ALJ next concluded that that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she may not climb ladders, ropes or scaffolds, or be exposed to workplace hazards such as unprotected heights or dangerous moving machinery, due to her use of sedative medication. She can work in environments with moderate noise or less, and with no heavy vibration such as jackhammers. She is restricted from work in bright sunlight or extremes of temperature. She can perform work that is not fast paced, that is, no assembly line work, piece work, work with strict production quotas, or work with rush periods, such as at meal times in fast food restaurants.

(R. at 26.) In reaching this RFC determination, the ALJ concluded that Dr. Dunnan's assessment that Plaintiff is unable to work on a regular and continuing basis is not entitled to controlling weight for multiple reasons. (R. at 29.) Citing inconsistencies between Plaintiff's daily activities and Dr. Dunnan's determination of her need for frequent breaks and absences, the ALJ rejected Dr. Dunnan's conclusion that Plaintiff will have absences of one to two days once or twice a week. (*Id.*) The ALJ assigned "partial weight" to the state-agency physicians. (R. at 31.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. at 32–33.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 33.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff advances four contentions of error. First, Plaintiff asserts that the ALJ erred in

failing to find Plaintiff disabled under Listing 11.03 at step three of the sequential evaluation

process. (ECF No. 18 at 10–12.) Second, Plaintiff maintains that the ALJ erred by failing to

consider her anticipated unscheduled absences on her ability to perform sustained work. (*Id*. at

12–13.) Next, Plaintiff asserts that the ALJ erred by finding that her migraine headaches were

due to drug abuse and drug-seeking behavior. (*Id*. at 13–14.) Finally, Plaintiff argues that the

ALJ erred when she conflated Plaintiff's reported activities of daily living with an ability to

perform work on a substantial gainful basis. (*Id*. at 14.) The Court considers these contentions of error in turn.

## A.     The ALJ's Finding at Step Three of the Sequential Evaluation Process

The Court finds Plaintiff's challenges to the ALJ's finding that Plaintiff was not disabled under Listing 11.03 at step three of the sequential evaluation process to be without merit.

A claimant's impairment must meet every element of a listing before the Commissioner may conclude that he or she is disabled at step three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove that all of the elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984); *see also SmithJohnson v. Comm'r of Soc. Sec*., 579 F. Appx. 426, 432 (6th Cir. 2014) ("[The] claimant must point to specific evidence that demonstrates he [or she] reasonably could meet or equal every requirement of the listing."). "It is insufficient that a claimant comes close to meeting the requirements of a listed impairment." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *see also Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (affirming Commissioner's decision where medical evidence "almost establishes a disability" under Listing). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). "The burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).

Migraines or severe headaches are not a listed impairment. *Coscarelli v. Comm'r of Soc. Sec.*, No. 1:15-cv-817, 2016 WL 5423476, at *3 (W.D. Mich. Sept. 29, 2016); *Shepard v. Comm'r of Soc. Sec.*, No. 3:14-cv-25, 2015 WL 4554290, at *4 n.3 (S.D. Ohio Mar. 24, 2015). "Listing § 11.03 is the most analogous listing for considering medical equivalence of migraine headaches." *Shepard*, 2015 WL 4554290, at *4 n.3. This listing provides as follows:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R., Pt. 404, Subpt. P. App. 1 § 11.03.[3] "In SSA National Q&A 09-036, the Agency clarified which 'essential components of listing 11.03' may be most relevant when considering whether a claimant's migraine headaches meet or medically equal a listing." *Dunlap v. Colvin*, No. 15–cv–02139, 2016 WL 5405208, at *9 (D. Colo. Sept. 28, 2016); *see also* R. at 260–63 (copy of Q&A 09-036); ECF No. 18 at 11 (citing Q&A 09-036 for guidance in evaluating migraine headaches); ECF No. 19 at 3–4 (same). The "essential components of listing 11.03 as they may be related to migraine headaches" include the following:

> 1. migraines "documented by detailed description of a typical headache event pattern, including all associated phenomena, [such as] premonitory symptoms, aura, duration, intensity, accompanying symptoms, and treatment;"

> 2. migraines "occurring more frequently than once weekly;"

---

[3] On July 1, 2016, the Social Security Administration ("SSA") revised the listings criteria used to evaluate claims based on neurological disorders, including section 11.00, effective September 29, 2016. 20 C.F.R. Pt. 404. The SSA will use the new listings "on and after their effective date in any case in which [it makes] a determination or decision." *Id*. at n.6. However, the SSA expects "that Federal courts will review the Commissioner's final decisions using the rules that were in effect at the time [it] issued the decisions." *Id*. Section 11.03 does not exist as a substantive listing under the revised listings. *See generally id*. Instead, revised listing section 11.02 (Epilepsy) is apparently analogous. *Id*. Here, however, the Court applies section 11.03, which was in effect at the time the Commissioner issued the decision. *Id*. at n.6.

3. migraines that "[alter] [ ] awareness;" however, "it is not necessary for a person with migraine headaches to have alteration of awareness as long as she has an effect . . . that significantly interferes with activity during the day," e.g., resting in a darkened room, or lying down without moving.

*Dunlap*, 2016 WL 5405208, at *9.  The SSA further explains in Q&A 09-036 that a migraine diagnosis

requires a detailed description from a physician of a typical headache event (intense headache with more than moderate pain and with associated migraine characteristics and phenomena) that includes a description of all associated phenomena; for example, premonitory symptoms, aura, duration, intensity, accompanying symptoms, and effects of treatment.  The diagnosis should be made only after the claimant's history and neurological and any other appropriate examinations rule out other possible disorders that could be causing the symptoms.

(R. at 261.)  "[O]ther clinically accepted indicators of the diagnosis" include headaches lasting from four to seventy-two hours if untreated or unsuccessfully treated as well as at least one of the following:  nausea, vomiting, photophobia, or phonophobia.  (*Id.*)  Additional clinically accepted indicators include two of the following:  a pulsating or throbbing headache; moderate pain intensity, worsened by physical activity (or causing avoidance of activity); or severe pain intensity, worsened by physical activity (or causing avoidance of activity).  (*Id.*)

The ALJ did not err in applying these standards.  At step two, she found Plaintiff's migraine headaches to be a severe, medically determinable impairment.  (R. at 23–25.)  For her step three determination regarding section 11.03, the ALJ stated as follows:

Although there is no listing for chronic headache, the allegations related to the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. (DI 24505.015 Finding Disability Based on the Listing of Impairments).  Listing 11.03 for nonconvulsive epilepsy (petit mal, psychomotor, or focal), must be documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  Seizure activity must be accompanied by alteration of awareness or loss of consciousness and transient postictal

manifestations of unconventional behavior or significant interference with activity during the day. Here, the medical evidence does not show headaches of the frequency and severity that the claimant alleges. The claimant was treated in the emergency room for migraine headaches on four occasions between 2000 and 2005, prior to the period under consideration (Exhibits 1 F, 3F, 4F). She most recently presented to the emergency room with a migraine headache in December 2005. At that time, she said her headache was 4/10 in severity, which was typical, and reported taking no narcotic medication, only Maxalt. After receiving Reglan and Ativan, she said her headache was 2/10, and was stable for discharge. (Exhibit 4F). Radiologic and other studies for headache and neck pain between 2003 and 2005 included a cervical MRI showing minor disc bulging and spurring from C3 through C6, and a minimally abnormal EEG with bitemporal dysrhythmia and sharp wave activity that was most likely a nonspecific finding (Exhibit 1F). Her objective findings are not of comparable medical significance to those of the most closely analogous listed impairment (DI 24505.015 Finding Disability Based on the Listing of Impairments). The claimant's reports of the duration and frequency of her migraine headaches is inconsistent with her report of activities of daily living, as described below.

(R. at 25–26.)

Substantial evidence supports the ALJ's determination. As set forth above, Listing 11.03 requires that Plaintiff experience migraine headaches more frequently than once weekly and that the migraines significantly interfere with her daily activity or alter her awareness. According to Plaintiff, she suffers from migraines two to three days a week with each episode lasting approximately one day, but relies on only her self-reports. (ECF No. 18 at 12 (citing R. 239–50 (Plaintiff's own calendar noting when she experiences migraines), 438 (Dr. Dunnan noting on May 21, 2013, that Plaintiff reported having two to three migraines a week), 456 (Dr. Hussein noting on November 22, 2013, that Plaintiff reported two to three migraines weekly), 463 (Dr. Dunnan noting on November 10, 2014, that Plaintiff reported having two to three migraines a week); *see also* R. at 29 (noting that Dr. Dunnan relied largely on Plaintiff's self-reports).) However, the ALJ determined that Plaintiff's reports of the duration and frequency of her migraines were not completely credible. "The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."

*Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints."  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record."  *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.* at 248.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2016 WL 1119029 (March 16, 2016); *but see Storey v. Comm'r of Soc. Sec.*, No. 98-1628, 1999 WL 282700, at *3 (6th Cir. Apr. 27, 1999) ("[T]he fact that [the ALJ] did not include a factor-by-factor discussion [in his credibility assessment] does not render his analysis invalid.").

In evaluating Plaintiff's credibility with respect to his subjective claims, the ALJ must determine whether there is an underlying medically determinable physical impairment that could

reasonably be expected to produce the claimant's symptoms. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Second, if the ALJ finds that such impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Kalmbach v. Comm'r or Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011). Pursuant to SSR 16-3p, the ALJ must evaluate seven factors in determining credibility:

> In addition to using all the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416(c)(3). These factors include:
>
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of pain other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

SSR 16-3p tasks the ALJ with explaining his or her credibility determination with sufficient specificity as "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brothers v. Berryhill*, Case No. 5:16-cv-01942, 2017 WL 29125, at *11 (N.D. Ohio June 22, 2017) (citing *Rogers*, 486 F.3d at 248).

Here, the ALJ reasonably discounted Plaintiff's allegations of the frequency and duration of her migraines based upon the record evidence reflecting her activities of daily living.[4] *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain."); *Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").  The ALJ specifically noted Plaintiff's ability to drive more than four times a week and leave the house four times a week for shopping, doctor's appointments, kid's activities, errands, and visiting friends.  (R. at 30.)  The ALJ further noted that Plaintiff took care of laundry, cooking, cleaning, child and pet care on days that she did not have headaches, which the ALJ found inconsistent with Plaintiff's reported two to three day per week or less of productivity.  (*Id.*)

The ALJ also reasonably considered inconsistencies in the record regarding the side effects of Plaintiff's mediation.  For instance, Plaintiff complained that multiple medications caused side effects, including sleepiness, nausea, dizziness, and diarrhea.  (R. at 30, 460.)  However, in her function report from a few months earlier, Plaintiff reported only one medication caused sleepiness.  (R. at 30, 197.)

The ALJ further considered that Plaintiff's treatment history undermined her hearing testimony that she lies in bed from two to seven days because of her migraines.  (R. at 30.)  The ALJ noted that the medical record reflected infrequent physician encounters during the relevant period despite Plaintiff's claims regarding the frequency and duration of her migraines.  (*Id.*)

---

[4] The Court addresses Plaintiff's contention that ALJ relied on a mistake of fact when considering Plaintiff's daily activities later in this decision.

Specifically, Plaintiff saw Dr. Dunnan only four times in 2013 and only twice in 2014. (R. at 30, 422–23, 438, 455, 461, 463.) Plaintiff treated with Dr. Hussein only one time during the relevant period. (R. at 456–59.) The ALJ properly considered the infrequency of this treatment when assessing Plaintiff's credibility as to the frequency and duration of her migraines. *See Buus v. Colvin*, No. 4:14–CV–04066, 2015 WL 2372615, at *9 (D. S.D. May 18, 2015) (considering, *inter alia*, the number of times the claimant sought treatment when determining that substantial evidence supported the ALJ's decision that the claimant's headaches did not meet criteria in Listing 11.03).

Plaintiff argues that the ALJ improperly considered that no treatment provider documented Plaintiff having headache symptoms during an office visit. (ECF No. 18 at 12.) However, as the Commissioner points out (ECF No. 19 at 4), the ALJ did not use this fact to reject the assertion that Plaintiff had migraines. Instead, the ALJ accepted that Plaintiff experienced migraines and used this fact simply to question Plaintiff's assertions regarding the frequency and duration of those migraines. (R. at 28.) As set forth above, this was just one factor the ALJ considered in assessing Plaintiff's credibility regarding the frequency and duration of the migraines.

In sum, the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial evidence and is therefore entitled to "great weight and deference." *Infantado*, 263 F. App'x at 475. Because Plaintiff's argument that the ALJ erred at step three was based on her self-reports, the ALJ reasonably concluded that Plaintiff's allegations regarding the frequency and duration of her migraines were not entirely credible. The Court therefore finds that Plaintiff has not met her burden to demonstrate that she meets or medically equals Listing 11.03. Plaintiff's first contention of error is **OVERRULED**.

**B.     The ALJ's Failure to Consider Plaintiff's Anticipated Unscheduled Absences**

Plaintiff next argues that the ALJ committed reversible error by failing to consider the effect of Plaintiff's anticipated unscheduled absences on her ability to perform sustained work. (ECF No. 18 at 12–13.)  She contends that Dr. Dunnan opined that she is expected to need one to two unscheduled breaks per week and that she would likely be absent from work more than four days per month.  (*Id*. at 13.)  Plaintiff argues that while the VE testified that someone who misses work two times per week would be precluded from performing sustained competitive work, the ALJ's RFC nevertheless did not anticipate any work absences at all.  (*Id*.)

Plaintiff's arguments are not well taken.  The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision); *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.").

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the ALJ considered Dr. Dunnan's opinion that Plaintiff would be absent one to two days once or twice week, but rejected it, reasoning as follows:

> Dr. Dunnan appears to be a treating source within the meaning of 20 CFR § 416.927. He has indicated that the claimant is unable to work on a regular and continuing basis. The opinion of a treating source is entitled to controlling weight where it is well supported by and not inconsistent with objective clinical and laboratory findings (Social Security Ruling 96-2p). However, this assessment is not entitled to that degree of probative consideration for multiple reasons. First, the doctor does not provide sufficient clinical and laboratory data to support his conclusion. He says the claimant is stable on her current medication regimen, but also has 2 to 3 headaches a week lasting hours or days, which appears inconsistent. He said he saw her every 2 to 3 months, but the medical evidence shows only one appointment in October 2013 after completing the form in May and two appointments in 2014 (See Exhibits 11F, 14F, l7F, 18F). This appears to show that the claimant's contact decreased significantly after Dr. Dunnan completed her disability paperwork, which raises doubts about the severity of her ongoing symptoms. Her infrequent physician contact after being detoxified from opiates also suggests that the headaches improved thereafter, which is consistent with Dr. Hussein's conclusion that her headaches were rebound headaches from the opiates. Dr. Dunnan does not provide a detailed function-by-function analysis that demonstrates the inability to perform any type of gainful activity, but appears to base his opinion largely on the claimant's report of her symptoms, which are not found to be fully credible. This report is given weight with regard to the report that her headaches were triggered by noise, bright lights, and vigorous exercise. His conclusion of the need for frequent breaks and absences several times a week is not consistent with the claimant's reports that she leaves the house four times a week for shopping, doctor's appointments, kid's activities, and socializing or with her hearing testimony that she drives four or more times a week for various reasons. Accordingly, his conclusion that the claimant will have absences of one to two days once or twice a week is rejected.

(R. at 29.)

The ALJ provided good reasons for rejecting Dr. Dunnan's opinion that Plaintiff would be absent one to two days once or twice a week. The ALJ properly considered the frequency of Dr. Dunnan's treatment and found that Dr. Dunnan's statements about how frequently he treated Plaintiff were inconsistent with the record evidence and his own treatment notes. *See* 20 C.F.R. § 404.1527(c)(4) (identifying consistency with the record as a whole as a relevant consideration); *Driggs v. Comm'r of Soc. Sec*., No. 2:11-cv-0229, 2011 WL 5999036, at *6 (S.D. Ohio Nov. 29, 2011) ("Further, an ALJ may reject the opinion of a treating source 'where the treating physician's opinion is inconsistent with [that source's] own medical records.'") (quoting *Jackson v. Astrue*, No. 3:09CV972, 2011 WL 854877, *5 (M.D. Ala. March 10, 2011)). In the Residual Functional Capacity Questionnaire regarding headaches that he completed on May 12, 2013, Dr. Dunnan stated that he saw Plaintiff "every month or two." (R. 29, 465.) However, the record and his treatment notes reflect that Dr. Dunnan actually saw Plaintiff only three times in 2013 before he completed the questionnaire and only three times afterwards (one more time in 2013 and two times in 2014). (R. at 30, 422–23, 438, 455, 461, 463.) These are rational grounds to discount a treating physician's opinion.

The ALJ also reasonably considered that Dr. Dunnan's opinion was based largely on Plaintiff's report of her symptoms. (R. at 29.) For the reasons previously discussed, substantial evidence supports the ALJ's determination that Plaintiff was not completely credible. Under these circumstances, the ALJ properly rejected Dr. Dunnan's opinion when this doctor relied on and accepted uncritically as true Plaintiff's subjective reports of symptoms and limitations. *See Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 273-74 (6th Cir. 2010) (finding that the ALJ did not err in rejecting medical opinion premised upon claimant's subjective complaints that were not supported by objective medical evidence); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877

(6th Cir. 2007) (holding that physicians' opinions are not due much weight when premised upon on reports made by a patient that the ALJ found to be incredible).

For all of these reasons, the ALJ's failure to consider Plaintiff's anticipated unscheduled absences on her ability to perform sustained work was not erroneous. *Id.*; *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 336 (6th Cir. 2007) ("[T]he ALJ 'is required to incorporate only those limitations [he] accept[s] as credible'" into the RFC.) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Plaintiff's second contention of error is therefore **OVERRULED**.

## C.    The ALJ's Consideration of Plaintiff's Drug Abuse and Drug-Seeking Behavior

Plaintiff also contends that the ALJ erred "by finding that the claimant's migraine headaches were due to drug abuse and drug-seeking behavior, despite the fact that this is not supported by the medical evidence in the file." (ECF No. 18 at 13; *see also* ECF No. 20.) Plaintiff further argues that the ALJ "placed great emphasis on Ms. Beerman's history of drug use and suggested that this drug use was the reason" for Plaintiff's headaches and that the ALJ "appears to insinuate that Ms. Beerman underwent an unnecessary surgery to receive narcotic medication." (ECF No. 18 at 13–14.)

Plaintiff's arguments are not well taken. In considering Plaintiff's past drug use, the ALJ stated as follows:

> The claimant was less than forthright in discussing her substance abuse with her psychological evaluator. She told him she had engaged in substance abuse because she had been taking Percocet and Lortab four times daily instead of the recommended one or two. Based on her report, he considered that her past substance use was not substance abuse (Exhibit 12F/4). In contrast, when she was admitted to rehab, she admitted taking 6 to 8 Lortab or 4 to 5 Percocet a day, taking eight tabs of Zanaflex at once, and taking all of her prescribed daily Xanax at one time rather than spacing it out through the day (Exhibit 7F/ 1). On another occasion, she admitted to taking 3 to 4 Percocet or Vicodin every two hours, not 3 to 4 per day (*Id.*, at 23). Her consulting psychological examiner may have

identified substance abuse or dependence if she had been accurate in reporting her actual consumption levels of controlled medications. The medical evidence reflects that the claimant's headaches were more frequent while taking narcotics, probably because of narcotic induced rebound headaches, although she said the medications brought them down in the severity from 8/10 to 4/10. She indicated the current medication only brought her headaches down to is 6.5/10. However, she was able to work at SGA levels for many years with chronic headaches even at a more frequent level. The medical evidence to show that the claimant received chronic opiate pain medication for menstrual cramps prior to her hysterectomy in 2005, which was performed due to her pain complaints, despite the fact that laparoscopic evaluation prior to hysterectomy was normal (Exhibits 2F and 3F/l 7, 27). The claimant told her gynecologist that her migraines occurred "monthly" at her July 2005 preoperative examination (Exhibit 2F). The reported increase in the frequency and severity of headaches appears to coincide with her inability to receive narcotic medication for menstrual pain, following her hysterectomy. This suggests the possibility that the claimant may have exaggerated her symptoms in order to obtain narcotics, a possibility that is supported by the claimant's decreased resort to medical care following the refusal of her primary care physician to prescribe them to her. The medical evidence and her report of her daily activities does not support her complaints that her headaches have intensified in terms of pain after she detoxed from narcotics. Her argument that she is no longer able to work because her medication are ineffective is rejected.

(R. at 31.)

In reviewing the above excerpt, the Court finds that Plaintiff has mischaracterized the ALJ's consideration of Plaintiff's past drug use. Instead of relying on drug abuse as a reason for Plaintiff's migraines, the ALJ described this past drug use as a way to assess Plaintiff's credibility regarding present assertions that her headache pain intensified after she discontinued abusing drugs. In doing so, the ALJ reasonably noted Plaintiff's decreased resort to medical care after her primary care physician refused to prescribe her narcotics. (*Id*.) In rejecting Plaintiff's present claim that her headaches intensified after detox, the ALJ properly considered the medical evidence described in detail earlier in this Court's decision and Plaintiff's daily activities. (*Id*.) Plaintiff's contention that the ALJ based her present findings on Plaintiff's past drug use is therefore a mischaracterization of the ALJ's analysis. The ALJ simply considered the pre-disability drug use as one way to illuminate Plaintiff's post-onset assertions.

Plaintiff's third contention of error is therefore **OVERRULED**.

## D.     The ALJ's Consideration of Plaintiff's Daily Activities

Finally, Plaintiff argues that the ALJ erred when she "conflated Ms. Beerman's reported activities of daily living with an ability to perform work on a substantial gainful basis." (ECF No. 18 at 14.)  Specifically, Plaintiff contends that the ALJ stated that Plaintiff "testified to driving four or more days per week." (*Id*.)  However, Plaintiff asserts that she "did not testify that she drives four or more *days* per week:  she testified that she drives four or five *times* per week[.]" (*Id*. (emphasis in original).)  Plaintiff therefore argues that the ALJ's mistake of fact in this regard is significant because the ALJ relied upon it when determining that Plaintiff's statements regarding the frequency of her headaches were not credible.  (*Id*.)

Plaintiff's arguments are not well taken.  In assessing Plaintiff's credibility, the ALJ stated, *inter alia*, as follows:

> As an initial matter, the claimant's statements concerning the frequency and duration of her headaches do not comport with her reported activities.  If she has 3 to 4 headaches a week that last 2 days to a week, requiring her to be in bed each time from 2 day to a week, the claimant would always be in bed.  Even at the low end of her report, 2 headaches requiring her to be in bed for 2 full days would require 4 full days of bed rest.  Contrary to this assertion, the claimant states that she drives *four or more days each week*.  She walks two to four days a week.  She shops in stores and socializes with friends and family.  There are simply not enough days in a week to accommodate these activities and the severe headache symptoms she describes.  I also note that although the claimant has received regular medical care, no treating provider documents her having headache symptoms during a doctor visit, other than the emergency room visits noted earlier and during her detoxification treatment in late 2012.  If her headaches were as frequent and severe as alleged, one would expect her to present at least occasionally with active symptoms.

(R. at 28 (emphasis added).)

> In her March 2015 headache report (Exhibit 15), the claimant said she had 2 to 3 headaches per week, lasting between one day and more than a week each time, and limiting her to being productive only 2 to 3 days per week or less.  As discussed above, with regard to statements made by the claimant's primary care

physician, the *claimant's ability to drive more than four times a week* and leave the house four times a week for shopping, doctor's appointments, kid's activities, errands, and visiting friends, while doing laundry, cooking, cleaning, child and pet care on days that she did not have a headaches (Exhibit 12F/5-6 and testimony), appears inconsistent with her reported 2 to 3 days per week or less of productivity.

(R. at 30.)

Plaintiff's argument mischaracterizes and takes out of context the ALJ's above consideration of Plaintiff's driving capacity. While the ALJ first observed that Plaintiff "drives four or more days each week[,]" (R. at 28), the ALJ later considered Plaintiff's "ability to drive more than four times a week[.]" (R. at 30.) Read in context, the ALJ properly considered Plaintiff's ability to drive multiple times a week along with her other daily activities that undermined Plaintiff's assertion that she was essentially bedridden for most of the week. Based on this record, the Court is not persuaded that the ALJ relied on a mistake of fact when assessing Plaintiff's credibility.

Plaintiff's fourth contention of error is therefore **OVERRULED**.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner of Social Security's decision.

**IT IS SO ORDERED.**


Date:  March 7, 2018                              *s/ Elizabeth A. Preston Deavers* _____
                                                                 ELIZABETH A. PRESTON DEAVERS
                                                                 UNITED STATES MAGISTRATE JUDGE